No. 46.—MARY J. JORDAN, adm'x, &c. plaintiff in error, *vs.*
BENJ. S. JORDAN *et al.* defendants. BENJ. S. JORDAN,
plaintiff in error, *vs.* MARY J. JORDAN, adm'x, &c. defendant.

[1.] A remitted judgment of the Supreme Court, is to have as much opera-
tion and effect in the lower Court, when there has been no *supersedeas* in
that Court, as when there has been one.

[2.] An amendment to a bill, which, in itself, would make a case that has in
it no equity, which, and if added to the bill, would render the bill multifarious,
will not be allowed, especially if one of the effects of the amendment would
be to compel the defendants to come to trial in a different county from that
of their residence.

[3.] An answer is full when the defendant, according to the best and utmost
of his knowledge, recollection, information and belief, has made a full, true
and direct answer to all and singular the several matters contained in the
bill; and that as particularly as if he were distinctly interrogated on each
separate matter.

[4.] A bill cannot be taken as confessed against a defendant, as long as a
plea, in bar of the latter, remains undisposed of.

In Equity, in Troup Superior Court. Decided by Judge
WARNER, May Term, 1854.

The bill in this case alleges, that on the 23d day of Septem-
ber, 1842, Benjamin S. Jordan, Farish Carter and Warren
Jordan and Reuben Thornton entered into an agreement, in
writing, that Benjamin S. Jordan and Farish Carter, should
gather up the property of Warren Jordan, and bring the same
to sale, by virtue of certain mortgage liens which they held
against Warren Jordan, or otherwise, as might be practicable.
That said B. S. Jordan and Carter should attend the sales and
buy in all the property; that it would not bring its value at
such sales, and re-sell the same at fair cash prices; that the
proceeds should be applied to the payment of the expenses in-
curred in bringing the property to sale, and then to the pay-
ment of the debts or claims which B. S. Jordan and Carter
held against Warren Jordan until they were paid, and the bal-
ance remaining should be settled on the wife and children of
Warren Jordan. Thornton engaged, in the contract, to assist

in carrying out this contract, and for which he was to be paid from the proceeds, a reasonable compensation.

The bill sets forth the debts then held by B. S. Jordan and Carter against Warren Jordan, to be paid by this agreement— and among them a note due to Benjamin S. Jordan, for $4,360, and a mortgage, purchased from the Georgia Rail-road & Banking Company, for about $15,000, and transferred to Farish Carter, but which the bill alleges, was really purchased by B. S. Jordan and Carter jointly. The bill sets forth, minutely and in detail, a large amount of property, real and personal, brought to sale in Hall County and Baker County, Georgia, and also in the Territory of Florida; that Carter and Jordan bought in the property, and instead of causing it to sell fairly, charges and states many fraudulent devices resorted to by them to depreciate it, so that by such false and fraudulent means, they became the purchasers of property fairly worth about One Hundred Thousand Dollars, for about Twelve Thousand Dollars; and that instead of re-selling it, as they were bound to do by the agreement, they had appropriated it it to their own use, and had refused to credit the debts with even the small sums for which the property was bid off by them. The bill alleges, as one reason which induced the defendants to act in this fraudulent manner, the fact that Warren Jordan had become infirm and much enfeebled in body and mind, and they believed he would never be able to bring them to an accounting. The bill distinctly alleges that they recovered property sufficient, at a fair cash value, to pay all their debts and expenses, and leave a balance of $75,000; and sets forth the property purchased at each sale specifically, and the frauds practiced at each sale, and the prices at which it was bid off. It also alleges that they had recovered other property, which was never brought to sale, and never credited at any sum, but appropriated. Warren Jordan died soon after these transactions, and Reuben Thornton also afterwards died. The complainant administered on the estate of Warren Jordan, but Reuben Thornton died insolvent, and had no administrator, and this is stated as the reason why he was not a party to the

original bill, but also states that before his death he had sold a negro of Warren Jordan, and had not accounted for the proceeds.

The bill further alleges, that Benjamin S. Jordan and Farish Carter still held open their claims against Warren Jordan, and pretended that they were unpaid; and that B. S. Jordan had instituted his action at Law in Troup Superior Court, against the complainant, as administratrix of Warren Jordan, on the note for $4,360, and that Carter was jointly interested with Jordan in the recovery sought on this note, and that they jointly planned and executed all the frauds charged, and were jointly interested in the spoils: that many of the facts alleged, the complainant was unable to discover, without a resort to the consciences of the defendants, and that the defendants had taken charge of many of the papers in the case, and kept them, and prayed that they be required to exhibit them for use and inspection. The bill prays an injunction of the Common Law action, that the defendants be compelled to account for the property at a fair cash value, and compelled to credit the proceeds upon their claims, until satisfied, and that the contract be specifically performed. There are several alternative prayers in the bill on this state of facts. The bill was returned to the November Term, 1852, of Troup Superior Court.

To this bill, the defendants filed their several demurrers and pleas to the jurisdiction of the Court of Chancery of the County of Troup, on the ground that both the defendants resided in the County of Baldwin, and accompanied their pleas with an answer in support of the pleas, specially denying that Carter had any interest in the note sued on at Law. These demurrers and pleas were over-ruled by the Judge of the Circuit Court, at the May Term, 1853, and the defendants sued out a writ of error to this Court, returnable to the August Term, at Decatur, 1853, at which Term, the cause was continued, and was afterwards determined at Macon, February Term, 1854. And the decision upon the writ of error was, that the Court of Chancery of Troup County had jurisdiction for the purposes of *discovery* only; but that the *relief* sought must be sought in the County

of Baldwin, as there was *no* defendant to the bill, in the County of Troup. In the mean time, as the defendants obtained no *supersedeas,* the cause was progressing in the Circuit Court, pending the issue on the writ of error in the Supreme Court. An order was passed at the November Term, 1853, giving the defendants until the 1st of April, 1854, to answer the bill, and in default of answer, it was to be taken as fully and finally confessed. In March, 1854, on application by the Solicitor of the defendants, the Solicitor for the complainant extended the time for answer from 1st of April to 1st of May ; and accordingly, by this time, B. S. Jordan filed his answer, but Carter did not answer.

In the mean time an administrator on the estate of Reuben Thornton had been appointed in the County of Troup, and before the return of the *remittitur* from the Supreme Court, the complainant filed an amendment to the bill, making his administrator a party defendant, and also making the widow and children of Warren Jordan parties complainants. The amendment further alleged, that the administrator of Reuben Thornton was claiming a considerable amount as due for the services of said Reuben, in bringing the property to sale, and for money advanced by him in the execution of the agreement ; and prayed a discovery from Jordan and Carter, and the said administrator, as to the services rendered, the money advanced (if any) and the amount which had already been paid him by Jordan and Carter from the proceeds of the sales ; and also prayed that if, on the final accounting, any sum was due Thornton, that the value of the negro sold by Reuben Thornton might be set-off to this amount, as the estate of Thornton would be otherwise unable to account for the value of this negro. This amendment also set forth a large amount of other property and money, which had been received by B. S. Jordan and Carter, not stated in the original bill, but discovered since, and added another prayer for relief. It was also agreed that this amendment should serve the purpose of an amendment and a supplemental bill. To the allowance of this amendment, the defend-

ants objected—1st. Because, before it was filed, the Supreme Court had, by its decision, made the original bill a bill for *discovery* only, and that such a bill could have no more parties than existed in the Common Law record, in aid of the prosecution or defence, of which the discovery was sought.

2d. Because a bill for discovery could not be converted, by amendment, into a bill for relief. The motion to amend was argued at the last May Term of Troup Superior Court, and the amendment was not allowed, and to this ruling the complainant excepted.

The complainant also filed exceptions to the answer of B. S. Jordan, as insufficient and evasive in many points. On the argument, the Court below sustained three of these exceptions, and ordered the said B. S. Jordan to answer over; and to this ruling the defendant, B. S. Jordan excepted; and also sued out his writ of error to this Court.

The remaining exceptions were over-ruled by the Court below, and the complainant excepted.

During this same term of the Superior Court, the *remittitur* from the Supreme Court, containing the decision of that Court on the former writ of error, was returned; and the defendants moved to make it the judgment of the Circuit Court at that time, and to vacate the proceedings had in the Circuit Court pending the issue for the writ of error in the Supreme Court— especially so far as such proceedings were inconsistent with the case, as a case for *discovery only*. To this the complainant objected, and insisted that as the defendants had sued out no *supersedeas*, and had progressed with the case voluntarily, they were bound by the proceedings; and that they had thus waived objections to the jurisdiction, and moved the Court to qualify the order entering the *remittitur*, so that it should not prejudice their subsequent proceedings. The Court refused to qualify the *remittitur*, and decided that the proceedings in the Circuit Court, pending the writ of error in the Supreme Court were void; and to this decision the complainant excepted. On a subsequent day in said term, the complainant moved an order absolute, taking the bill confessed, as to Carter, which or-

der the Court below refused, and this also is assigned for error.

The several exceptions in these cross-writs of error, are now assigned in a consolidation of the records, as errors in the Court below, and asked to be reviewed by this Court.

B. H. HILL, for plaintiff in error.

C. J. McDONALD and H. WARNER, for defendants in error.

*By the Court.*—BENNING, J. delivering the opinion.

In this case the cross-bills of exceptions were heard together.

One of the assignments of error made by Mrs. Jordon on her bill of exceptions was, that the Court below gave too much effect to the judgment of this Court, which had been remitted to that Court.   It seems that the bill of exceptions, on which that remitted judgment had been rendered, had not been made to operate as a *supersedeas*, and so that subsequent to the allowance of that bill of exceptions, steps in the case had been taken in the Court below, as if no bill of exceptions had been allowed; and that when the *remittitur*, with the judgment of this Court on the bill of exceptions reached that Court, the judgment was held by that Court to operate as if there had been a *supersedeas* in the case—as if, since the allowance of the bill of exceptions, no steps at all had been taken in the case.   On this holding of that Court, Mrs. Jordan found one of her assignments of error.

The fifth section of the Act of 1845, which organizes this Court, contains, among others, these words : " Upon the decision of said Supreme Court on matters of Law or principles of Equity, which may arise in the bill of exceptions," " the Court shall cause to be certified to the Court below such decision, and award such order and direction in the premises, as may be consistent with the law and justice of the case—which decision, so rendered, and order and direction so awarded, shall be respected and carried into full effect by the Court below". (*Cobb's Dig.* 450.)   The decision remitted is to be respected and car-

ried into *full* effect. This is the language of the Statute. And if the law were different, what would the higher Court be worth?

What odds does it make that a *supersedeas* is not obtained? Whether there shall be a *supersedeas* or not, is optional with the party excepting. If he does not do what is necessary to make his bill of exceptions operate as a *supersedeas*, the other party may go on with the case or not, at his pleasure. If he chooses to go on, he must do so at his peril. Taking the chances of an affirmance, he must run the risk of a reversal; and as by an affirmance he would gain all the ground he passes over, so by a reversal he must lose it all. The words which I have quoted, defining the effect and operation which a judgment of this Court is to have in the Court below, come in the Statute after the words which relate to a *supersedeas*, and therefore they cover cases in which there may have been no *supersedeas*, as well as those in which there may have been one.

1. The Court below was right, therefore, in holding that the judgment of this Court was to have as much effect and operation, although there had been no *supersedeas*, as it would have had, had there been a *supersedeas*.

The important assignment of error on the part of Mrs. Jordan, is that which she founds on the refusal of the Court below, to receive her offered amendment of the bill.

The bill, as it stood under the remitted judgment of this Court, was only a bill for discovery. The effect of that remitted judgment was, that as Carter and Jordan, the defendants in the bill, resided in Baldwin, the Court in Troup had no such jurisdiction over them as to authorize it to retain the bill against them as a bill for relief, although it might retain it as a bill for discovery.

The amendment, had it been allowed, would have had the effect to turn the bill, thus being a bill for discovery only, into one for general relief and discovery, and so to compel the defendants, Carter and Jordan, to come out of the county of their residence, Baldwin, and defend themselves in Troup, generally, against all the matters that would be contained in the bill. The

matters already contained in the bill were many, various and somewhat complex; and they were made the foundation for a claim on the part of the plaintiff, amounting to from $75 000 to $100 000.   And the matters contained in the offered amendment were such, that if the amendment had been received, they must have rendered the bill much more bulky and complex than it already was.

The effect, then, of the amendment had it been received, would have been to force Carter and Jordan to leave Baldwin, the county of their residence, and come to Troup, the County of the residence of the plaintiff, to defend themselves against a case of such magnitude as this.   And to produce that effect was doubtless the sole purpose of the amendment, as will be seen from what was the nature of it.

What was the nature of it?   Was it of such a nature that it would have warranted the Court below in receiving it to produce the aforesaid effect?   This is the precise question.

Among the things which the amendment proposes to do, is to make Anthony R. Thornton, as the administrator of Reuben Thornton, deceased, a party defendant to the bill; and to state, in substance, that Carter and Jordan owe him, as such administrator, a debt; and that he owes Mrs. Jordan, as administratrix of Warren Jordan, another debt: and that the *estate* of Reuben Thornton which he, Anthony, represents, is insolvent—not that he, *Anthony*, is; all to the end that Carter and Jordan may be prohibited from paying him, Anthony, the debt which they owe him; and may be compelled, instead, to pay the debt to her, Mrs. Jordan, in satisfaction of the debt owed to her by Anthony.

Is what is thus proposed to be stated, by way of amendment, of such a character that it would have warranted the Court below in receiving it—in receiving it to produce the aforesaid effect; for if it is not, there clearly is nothing proposed to be stated, which is.

It is *not* of such a character, and for two reasons—First. What is thus proposed to be stated, makes such a case that if taken by itself, it has in it no equity; and if taken as

part of the bill, it deprives the bill of all the equity which it has in it, by rendering the bill multifarious.

As to the first reason.   As long as Anthony R. Thornton is *himself* solvent, the creditors of the estate he represents cannot come to loss by any mal-administration of the estate, on his part ; and this whether the *estate*, itself, is solvent or insolvent.   For any mal-administration he will be personally liable to those creditors ; and being solvent, he will be able to make good any personal liability.   This being so, what principle is there, of Law or Equity, that will justify those creditors to interfere with his administration, by compelling his debtors to pay their debts to them, rather than to him?   There is none. Such interference is allowable only when the administrator is personally insolvent, so that it would be dangerous to trust the assets in his hands, or when some similar reason exists.   The insolvency of the *estate* represented by the administrator, is not a similar reason.

As to the second reason.   Even if the matter thus proposed to be stated, by way of amendment, contained in itself equity ; yet, it is such matter as makes a complete, new and independent case—a case that might well exist in a separate bill—a case which does not need any help from the old bill—a case to which the old bill could render no help.   Such matter, if added to the old bill, would make that bill multifarious.   This is clear.

Now the question is, would the Court have been warranted in receiving, by way of amendment to the bill, such matter as this—matter making a case that, in itself, had no equity in it —matter that, if added to the old bill, would have rendered that bill multifarious—when the effect of receiving it would have been to force the defendants, Carter and Jordan, to leave their county and come to the plaintiff's county, to defend themselves against all the matters that the bill, with these additions to it, would have come to contain ?

In what cases may persons be sued out of the county of their residence?   It is a general rule, that all cases, whether at Law or in Equity, over which the Superior or Inferior Court or

Courts have jurisdiction, are to " be *tried* in the county where-in the defendant resides". This rule, as to cases at Law, is the direct command of the Constitution itself; and as to cases in Equity, it is, if not the direct command of the Constitution, of which there is great doubt in my mind, the result of a well settled principle of Law, viz: the principle, that Equity follows the Law. And ought it not, much more, to follow the Constitution? This is the general rule. To this general rule, however, the Constitution has, itself, made exceptions. It excepts the case of joint promissors and joint obligors, of whom some reside in one county and some in another; also, the case of indorsers residing in a different county from that of the maker. And the Constitution makes no other exceptions. Ought Courts of Equity to do what the Constitution has not done? Ought they to make exceptions which the Constitution, although having in mind the subject of exceptions, has not thought fit to make? Ought they to do this in the face of the fact that the expression, "all civil cases" in this command of the Constitution—" all civil cases which shall be tried in the county wherein the defendant resides", when taken according to its *common* legal import, includes cases in Equity? I must express my doubt whether they ought or can.

Ought not the case which they should select as an additional exception, to be one in which there should, at least, be some equity against each defendant, and some privity, as between all the defendants? Ought the case to be such, that as to those of the defendants who might reside in the county in which the suit might be brought, it should be a case which would have in it no equity, for the reason, that as to them, there would be an adequate remedy at Law; and as to them *and* the other defendants—those to be brought out of their counties, it should be a case which, for another reason, would have in it no equity, viz: the reason that, as to all, it would be multifarious? Most certainly it ought not to be. Therefore, Courts of Equity ought not to make the present case an additional exception.

Indeed, if the case were such as not to have in it this ques-

tion of jurisdiction, growing out of the fact that the residence of the defendant is in a different county from that in which the suit has been brought, if it were the common case in which all the defendants reside in the county of the suit; still, such matter as that in question, proposed to be added to the bill, could not, according to any rule of Equity with which we are acquainted, be admitted into the bill by way of amendment. How much more, then, is this so, the case being as it is?

The decision in *Gilbert vs. Thomas,* (3 *Kelly,* 575,) is a direct authority to show that defendants are not to be brought out of the county of their residence, upon such a case as would be made, if the matter aforesaid were admitted into the bill, by way of amendment.

It was said, by the Counsel for Mrs. Jordan, that these were not the objections to the amendment, presented in argument to the Court below; and it was insisted, that therefore they ought not to be considered by this Court. But the judgment of the Court below is general—is not put on any expressed ground. If any good ground exists for it, ought not this Court, therefore, to presume that to have been the one by which the Court was influenced? Besides, are parties to be restricted in this Court, to the same arguments which they used in the Court below?

The matter aforesaid, then, relating to Anthony R. Thornton, was such as could not properly be allowed to be added to the bill, by way of amendment.

But the amendment containing this matter, was offered as a whole, and was considered as a whole. This part being such as was not allowable, the whole was rendered such as was not allowable.

[2.] The refusal of the Court below, therefore, to allow the amendment, was right.

Still, it is not improper, perhaps, to say that there is matter in the proposed amendment, which it would be right to have put in the bill, viz: all that matter which relates to the possession of the negroes in Florida, by Long, and that which relates to what the defendants realized out of other property

than the lands and negroes in Hall—the negroes in Florida, and the lands in Baker. These are proper matters for discovery, and would be in harmony with what is already in the bill; and doubtless the Court, on a proper application, would allow them to be added to the bill.

A number of exceptions, for insufficiency, were taken to the answer of B. S. Jordan. Of these, three were sustained by the Court, and the rest over-ruled. To as much of the decision as sustained the three, B. S. Jordan excepted; to the other part, or to most of it, Mrs. Jordan excepted.

The same law is applicable to both parts of this decision.

[3.] When is an answer full? What sort of an answer is a plaintiff in Equity entitled to have from a defendant? In *Daniel's Chancery Practice* it is said, that " The nature of the answer which a plaintiff is entitled to require from each defendant upon the record, is sufficiently shown by the form of words made use of in the bill for requiring an answer, viz: ' that the defendant may, upon his corporal oath, according to the best and utmost of his knowledge, recollection, information and belief, full, true, direct, perfect and sufficient answer make to all and singular the several matters and things hereinbefore contained, and that as fully and particularly as if the same were here again repeated, and he thereunto severally and distinctly interrogated.'" (2 *Danl. Ch. Pr.* 246.)

This is no doubt so. And with this for guide, it becomes a most easy and simple affair to ascertain whether an answer is sufficiently full or not; and guided by this, we find nothing wrong in either part of this decision; and to go into a long detail to show that, would be a mere waste of time.

This judgment, therefore, ought to be affirmed. And this disposes of the case brought up by B. S. Jordan.

[4.] The Court was right in refusing to let the bill be taken as confessed by Carter. His plea—a plea in bar, was still undisposed of. As long as this was so, the plaintiff had no right to call for an answer. The object of the plea was, perhaps, to protect Carter from ever having to answer.

There is nothing else in the case requiring notice.

The judgments excepted to by both sides ought to be af-firmed.