1. Where in a settlement between a landlord and a tenant the landlord credited the tenant with a sum for which the tenant agreed that "as soon as the same arrived and was ready for delivery" he would "turn over" to the landlord a check for "parity on cotton" which he was to receive from the Federal government, and where on receipt of the check he failed and refused to indorse and deliver it to the landlord, the tenant being insolvent, the landlord could maintain an action for specific performance to require the tenant to indorse and deliver the check in accordance with the agreement. The petition stated a cause of action for specific performance, injunction, and receivership.
2. It appearing on interlocutory hearing that the defendant had indorsed and cashed the check and had also disposed of the proceeds before the hearing, it was error to grant an injunction to restrain the defendant from indorsing the check or from disposing of the proceeds, these acts having been completed; and this is true notwithstanding the defendant in the performance of one or more of such acts may have violated a previous restraining order.
3. An order restraining the defendant from indorsing and cashing a check fairly comprehended disposition of the proceeds in the event of its collection by the defendant; and it appearing from the evidence that the defendant did dispose of such proceeds after knowledge of the restraining order, the court did not err in adjudging him in contempt for so doing.
 No. 13128. MAY 23, 1940.
On July 13, 1939, Mrs. Max L. McRae, doing business as Cedar Park Farm, filed against Jeff Reid an equitable petition, in which she made the following allegations:
"2. That your petitioner, through the manager of said farm, Max L. McRae, rented to the defendant a farm to be cultivated by him on the lands of petitioner for the year 1938 at and for a rental of $150.
"3. In addition to furnishing said defendant with said land, petitioner supplied said defendant with fertilizer, cottonseed, corn, hay, and oats, and cash for hiring labor and for paying the cost of gathering and harvesting said crop, including said rent, to the amount of $399.94. *Page 324 
"4. That in the settlement for said supplies and the rent due by the defendant to petitioner the defendant desired that petitioner should pay to him the parity paid by the United States government on the cotton grown on said premises in and during said year, and proposed to petitioner through the manager of said farm aforesaid that the parity price of said cotton be paid to him, the defendant, and that petitioner take and receive and that defendant would turn over to petitioner the government check for said parity on said cotton when the same arrived and was ready for delivery.
"5. In pursuance of said proposal of defendant petitioner paid to defendant two and four-tenths cents per pound on the total cotton grown and harvested by said defendant, amounting to 3114 pounds, or an aggregate of $74.73.
"6. That said government parity check has now arrived and is in the hands of the county demonstration agent, ready for delivery, but that the defendant fails and refuses to indorse said check or to turn the same over to petitioner, and fails and refuses to account to petitioner for said sum of $74.73 so paid to the defendant by petitioner under the agreement aforesaid.
"7. That in making said settlement and paying to the defendant said parity allowance made by the government, petitioner did so on the agreement and understanding that said defendant, on the arrival of said check, would indorse the same and cause the county agent to deliver said check to petitioner in order that petitioner might secure reimbursement for the purchase of said parity check as aforesaid.
"8. That petitioner and the defendant in calculating said parity payment did so on the basis of the cotton produced by said defendant. Petitioner is informed and believes that said parity check now in the hands of the county agent as aforesaid is for a sum slightly in excess of said amount of $74.73 so paid by petitioner to defendant, on account of the fact that the same was calculated and the amount thereof arrived at on a slightly different basis. That your petitioner is willing and has offered to pay the defendant the difference between the amount heretofore paid to defendant by petitioner on said parity payment or check, but that said defendant declines and refuses to consent to the delivery of said check to petitioner or that petitioner have any part thereof.
"9. That said defendant is wholly insolvent; and should said *Page 325 
defendant receive and cash said check he will refuse, as he has already announced his intention so to do, to pay to petitioner any part of said sum of $74.73. That being insolvent and unable to respond to any judgment that may be rendered, that said loss and damage to petitioner will be irreparable unless restraining order and injunction issue and defendant be required to specifically perform his contract.
"10. That the process of garnishment or attachment does not lie in said case, because of the nature of said fund and the payment thereof.
"11. That said defendant should be restrained and enjoined from indorsing or cashing said check, and should be required to specifically perform his said contract and indorse said check and deliver the same to petitioner in order that petitioner may cash said check and take therefrom the amount so paid by petitioner to the defendant.
"12. That a receiver should be appointed to take possession of, hold, and preserve said check pending the trial of this case and the final direction and adjustment therein."
The plaintiff prayed: "(a) That said defendant be restrained, and on the hearing hereof enjoined, from indorsing or cashing said check so held by [him] or that may have been delivered to him by the county agent of said County of Telfair, except to indorse the same and make delivery thereof to your petitioner. (b) That said defendant be required to specifically perform his said contract with your petitioner and indorse and deliver said check to your petitioner upon petitioner's paying to said defendant the difference between the amount of said check and the amount of $74.73 so paid by petitioner to said defendant for parity allowance by the United States government to said defendant. (c) That a receiver be appointed to take and hold said check pending the final judgment and decree of the court, and to dispose of the same and the proceeds thereof in accordance with the order and decree of the court. (d) That petitioner have judgment against said defendant for said sum, and a decree that the same be paid from the proceeds of said check. (e) That petitioner have such other and further relief as to the court may seem meet and proper and the exigencies of the case may require."
The defendant demurred to paragraphs 11 and 12 of the petition *Page 326 
and to prayers a, b, c, and e, upon the ground that there was no equity in them, in that the allegations did not show cause for injunction or appointment of a receiver. The defendant's answer admitted the making of the rental contract as alleged in paragraph 2, and the furnishing of supplies as alleged in paragraph 3, but not the amount of such supplies. His answer amounted to a denial of all other allegations. He further alleged that he had fully paid the plaintiff for all items furnished to him, and did not owe the plaintiff any sum whatever, and that in fact the plaintiff was indebted to him $75 "for the run of his field; that the plaintiff through her agents, servants, and employees refused to allow and permit this defendant to use the run of his fields; and that the reasonable value of the run of said fields were and is $75, for which amount he prays judgment." With reference to the check in question, the defendant alleged "that he has already received said check and spent the money thereon; said check having been received and cashed prior to the time the instant suit was served on him."
On July 22, 1939, the plaintiff amended her petition by adding the following allegations and prayers: "1. On information and belief petitioner alleges that since the filing of the above-stated cause the defendant has received, indorsed, and cashed said government check, and that said defendant now has the proceeds of said check in his possession and custody. 2. That said defendant, unless enjoined from otherwise disposing of said money and from withholding the same from petitioner, that he will dispose of said funds, and the same will not be available to the direction of the court and to the payment of said debt or obligation when final judgment is entered hereon; and petitioner by reason thereof will suffer irreparable injury. 3. That the receiver applied for in said original petition and that may be appointed by the court should be authorized to take possession of said money, and the defendant restrained and enjoined from withholding the same from such receiver, that the receiver may hold and preserve said fund until the final judgment, order, decree, and direction of the court therein. Wherefore petitioner prays that this her amendment be allowed, and that said defendant be restrained and enjoined from disposing of said money and from withholding the same from your petitioner; that receiver be appointed by the court to take possession of and to hold said fund pending the further order of the court, and that *Page 327 
said defendant be restrained and enjoined from withholding said fund or otherwise interfering with said receiver in taking possession thereof; and petitioner will ever pray."
On interlocutory hearing Max L. McRae, for the plaintiff, testified: "At the time I rented this farm to Jeff Reid it was agreed that I was to have the run of the field, and he was not to put any stock in the same. I furnished him velvet beans to plant in his corn, but he failed to plant them. He failed to gather his corn and peanuts, and I had to have them gathered. I gave him credit in our settlement for all of the corn and peanuts produced, at the market price, and also for the peanut hay. At the time we had our final settlement in the fall I allowed him credit for $74.73, being the government subsidy or parity on the cotton allotment for this farm, which amounted to 3114 pounds at two and four-tenths cents per pound, aggregating $74.73. After crediting him with this amount on his rent note, I was due him $10.60, which amount I paid him, and marked his said notes paid. The amount actually received by him from the government on this parity or subsidy payment was something over $93. After the check was received by the county agent, he repeatedly promised to meet me at his office and indorse the check to me for my interest in same, and I would give him the excess; but he failed to do so. He stated to me just after the injunction was served on him that he had cashed the check but had spent only about $5 of the same, having the balance in his possession. At this time I advised him of the injunction restraining him from disposing of the proceeds of the check; and he was also advised by the sheriff, in my presence, to the same effect. The suit was filed early in the morning, and after it was filed I understand that the defendant soon thereafter went to the county agent and demanded the government check. Not being restrained from so doing, the county agent delivered the check to defendant before he had been served in the case with a copy of the proceedings. Shortly thereafter he was served by the sheriff. Thereafter the sheriff, myself, and the defendant went to the office of my attorney, W. S. Mann, and the sheriff told Mr. Mann that the defendant had already gotten the check from the county agent and cashed the same. Mr. Mann asked what he had done with the money, and the defendant stated in our presence that he had all of the money in his pocket, with the exception of about five dollars he had already *Page 328 
spent. Mr. Mann then informed the defendant in our presence that the purpose of the suit was to recover the money on that check, and that he was enjoined from disposing of it; that the effect of the injunction was to prevent him from disposing of that check or the proceeds of the check; and that he had better keep the money until the hearing before the court; otherwise he would be in contempt of court. In making the settlement with the defendant he wanted to sell and assign to me his parity payment from the government, which he thought and I thought would be two and four-tenths on 3114 pounds of lint-cotton. I agreed with him to take the assignment and to pay him for his parity by crediting him with a sufficient part thereof to cover the balance of his account for rent and supplies, and to pay him the difference in cash. I credited him with enough of the parity to pay his account and rent, and paid him the difference, making a total of $74.73. He then agreed that when the check came he would indorse it and have the county agent deliver it to me."
The defendant testified by affidavit as follows:
"I am not indebted to Mrs. Max L. McRae, Cedar Park Farm, or Max L. McRae in any amount whatever, but on the other hand have paid my account with said parties in full, and hold receipts executed by Max L. McRae, agent for Cedar Park Farm, evidencing full payment of my account. I rented from Cedar Park Farm fifty acres of land for the year 1938, executing my note for $150 therefor, which said note has been paid in full and entry of payment entered thereon by Max L. McRae, and the same is now in my possession. In addition to the rent due aforesaid, I was indebted to Cedar Park Farm in the sum of $219.71 for guano, cottonseed, corn, and oats, for which I executed my note. The same has been paid in full as evidenced by entry made by Max L. McRae, and was thereafter delivered to me, which I now hold. Several months after I rented this farm, Joe Crapps, overseer in charge of said farm, informed me that I had better not make application for rentals paid by the government under the agricultural adjustment act on the farm that I had rented from Max L. McRae, or Cedar Park Farm, because if I did I would lose the government benefits on another farm that I was working separately from the farm rented from them, and not the property of Cedar Park Farm. Later I went to the office of Mr. Chafin, county agent, telling him *Page 329 
what Mr. Crapps had told me with reference to benefits on the lands rented from Cedar Park Farm; whereupon I was advised by the county agent that I should make the application; and that I was entitled to the benefits if I was renting the farm; and at this time I made application for the benefits. Max L. McRae asked me several times before the check in question arrived to give him half of the same; that he thought he was entitled to half of same; but I never agreed to give him any portion of said check. I received the check about eight-twenty o'clock on the morning of July 13, 1939, and was served with the petition and process in the case at about eleven o'clock a. m. on the same date, at which time I had already indorsed and cashed the check, and have now expended the same. That instead of being indebted to Mrs. Max L. McRae or Cedar Park Farm, they are on the other hand indebted to me in the sum of $75 for the run of the field on the lands rented from them by me, for that the said Joe Crapps did take, deprive, and alienate for their own use all of the run of the field on said lands for the year 1938, including peas, velvet beans, hay, and peanuts. On many occasions I attempted to place my stock in said field, but my attempt and requests to so do was denied by Joe Crapps and Max L. McRae, who forbade me to place my stock in the field. Thereafter Max L. McRae and Joe Crapps placed their hogs and the hogs of Cedar Park in said field, and the run of the field was consumed by their stock. The run of the field was well worth the sum of $75."
The petition, the amendment, and the answer were each positively verified. On the hearing these pleadings were introduced in evidence. The rent note and the note for supplies were introduced, and showed entry of payment thereon as alleged by each of the parties. It was admitted by the defendant that he was insolvent, as alleged in the petition. While the case was under consideration by the judge, the defendant, on motion of the plaintiff, was cited to show cause why he should not be adjudged in contempt of court for violation of the restraining order granted on the petition. The judge overruled the demurrer, granted an interlocutory injunction, and appointed a receiver. His order directed the receiver to receive and hold the check or the funds, subject to the further order and judgment of the court, and that the defendant deliver to the receiver the check in question, or in lieu thereof pay to him the *Page 330 
sum of $74.73 to be held as aforesaid. The defendant was at the time adjudged to be in contempt of court "for attempted evasion of the order of court heretofore granted," and that upon his failure to comply with this order he be committed to the jail and there held until he purges himself by delivering to the receiver the check or the money as directed, "the proceeds thereof to be dealt with as provided by law." To each of these rulings the defendant excepted.
1. It appears from the allegations and prayers that the main purpose of the suit was to obtain the relief of specific performance, requiring the defendant to turn over "to petitioner the government check for said parity on said cotton when the same arrived and was ready for delivery," in order that petitioner might collect and have as her own the money represented thereby. If such was the nature of the agreement, it would reasonably include an indorsement of the check by the defendant. The petition alleged, in effect, that the plaintiff had paid to the defendant the full amount agreed upon as consideration for the check; and that on discovery of the fact that it called for an amount in excess of the consideration so paid, the plaintiff offered to pay the difference, but that such offer was declined by the defendant. The petition further alleged that the defendant is insolvent.
As a general rule, equity will not decree specific performance of a contract relating to personality. Code, § 37-803; Carolee
v. Handelis, 103 Ga. 299 (29 S.E. 935); Gabrell v.Byers, 178 Ga. 16 (172 S.E. 227). But there are exceptions to this rule, and insolvency alone may supply basis for an exception. In Shockley v. Davis, 17 Ga. 177 (63 Am. D. 233), it was held that where A agreed with B that in consideration that B would become his surety to C, A would turn over to B choses in action for his indemnity, and where A was in failing circumstances, a court of equity would decree specific performance of the contract. In Saulsbury v. Blandys,60 Ga. 646, it was held that where property was sold and delivered to a third person on the faith of a promise by the defendants to accept his draft for the purchase-money, specific performance of such contract to accept the draft might be enforced in behalf of the seller in whose favor the draft was to be issued, the purchaser being insolvent. *Page 331 
In National Life Insurance Co. v. Beck Gregg HardwareCo., 148 Ga. 757 (98 S.E. 266), this court sustained an action against an insurance company for specific performance of an agreement to extend or renew an insurance policy. Under these authorities, the petition stated a cause of action for specific performance; also for injunction and receiver.
The principle that creditors without a lien may not as a general rule obtain injunction or other extraordinary relief in equity is inapplicable. Code, § 55-106. The plaintiff did not sue as a creditor. According to the petition, all accounts between the parties have been settled, and in the contract of settlement the plaintiff simply became entitled to the parity check upon its issue and delivery to the defendant. Nor is there merit in the contention that the petition did not show an equitable assignment, that is, an intention of the parties to effectuate an immediate change of ownership with respect to the particular fund in question. Compare Jones v. Glover, 93 Ga. 484
(21 S.E. 50). It is not essential that the fund assigned shall be in actual existence at the time, but it is sufficient if it "exists potentially." Walton v. Horkan, 112 Ga. 814 (38 S.E. 105, 81 Am. St. R. 77); Brown Guano Co. v. Bridges, 34 Ga. App. 652
(2), 656 (130 S.E. 695. The agreement, if given effect
according to its terms, did not leave the assignor with any right of control of the fund, either by revocation or collection, but as between the parties his only authority was to receive the check, and then to indorse and deliver it to the plaintiff. Accordingly, Reviere v. Chambliss, 120 Ga. 714
(48 S.E. 122), is not in point. We think the allegations were sufficient to show an equitable assignment; but this is not to imply that even if the petition should be construed otherwise, it would be defective as a suit for specific performance.
Neither the Federal government nor any agency of it was sued or made a party defendant. Nor does the defendant's check represent a salary of an officer or government employee. Consequently the case does not come within the principle that the salary of such an officer or employee can not be made the subject of a garnishment or receivership. Dotterer v. Bowe, 84 Ga. 769
(11 S.E. 896); Morgan v. Rust, 100 Ga. 346
(28 S.E. 419); West v. Floyd, 186 Ga. 190 (197 S.E. 236).
The court did not err in overruling the demurrer to the allegations *Page 332 
and prayers for injunction and receivership. Compare Bell v.Dawson Grocery Co., 120 Ga. 628 (48 S.E. 150); Arnwine v.Beaver, 134 Ga. 377 (67 S.E. 937); Brandt v. Hofmayer DryGoods Co., 146 Ga. 649 (92 S.E. 53).
2. The evidence introduced on interlocutory hearing showed without dispute that the defendant had received and cashed the check even before service of the petition and the restraining order, and authorized the inference that he had spent the proceeds before the hearing. The judge held the defendant in contempt of court for having disposed of the money after knowledge of the restraining order, and so must have found that he had spent the money before the hearing, as contended by him. In these circumstances the judge erred in granting an injunction to restrain the defendant from indorsing and cashing the check, as prayed in the petition, and from disposing of the proceeds, as prayed in the amendment. The acts against which the plaintiff sought injunction having been completed before the interlocutory hearing, the prayers for injunction should have been refused.Sims v. Boyd, 177 Ga. 465 (2) (170 S.E. 375); Braswell
v. Clark, 180 Ga. 727 (180 S.E. 486); Georgia PacificRailway Co. v. Douglasville, 75 Ga. 828; Simmons v.Lindsey, 144 Ga. 845 (2) (88 S.E. 199); Shurley v.Black, 156 Ga. 683 (2) (119 S.E. 618). But it does not follow that the defendant could not be held in contempt, provided the other facts authorized an adjudication to that effect. The question of contempt will next be considered.
3. The only restraining order was that issued on the original petition, restraining the defendant from indorsing or cashing the check except to indorse and deliver it to the plaintiff; no injunctive order having been passed on the amendment. The defendant had cashed the check and received the proceeds before he was served and before he was informed that the restraining order had been granted. After knowledge of the order, however, he disposed of the proceeds; and for having done so he was attached and held in contempt. The question is whether the judge was authorized to find that the act of the defendant in disposing of the proceeds constituted a violation of the order restraining him from indorsing and cashing the check. We think so. According to the plaintiff's evidence, she had purchased the defendant's right to the parity payment, and had fully paid the agreed consideration. Whether she *Page 333 
was bound to pay more when it developed that the sum payable to the defendant exceeded their estimate, the evidence showed that she did offer to pay the difference, and that the offer was refused. In these circumstances the plaintiff acquired an equitable title to the right of the defendant to the parity payment, which equitable title attached to the check on its delivery to the defendant, and embraced the proceeds on collection of the check by him; and this is true regardless of whether the original transaction amounted to an equitable assignment, as indicated in division 1 of this opinion. Pitts
v. McWhorter, 3 Ga. 5 (46 Am. D. 405); Winter v. Jones,10 Ga. 190 (54 Am. D. 379); Floyd v. Floyd, 97 Ga. 124
(2) (24 S.E. 451); Ogden v. Dodge County, 97 Ga. 461
(25 S.E. 321); Grace v. Means, 129 Ga. 638, 642
(59 S.E. 811). The check was a mere paper, without value except for the money it represented; and so its proceeds or the right to the proceeds constituted the substantial matter in controversy. In 32 C. J. 492, § 857, it is stated: "In order to authorize punishment for a violation of an injunction, the acts complained of must be clearly embraced within the restraining clause of the injunction. Whether or not particular acts constitute a violation of an injunction depends largely upon its special provisions. In determining whether there has been a breach or violation of an injunction, the decree or order for injunction is to be construed with reference to the nature of the proceeding and the purpose of the injunction; and it is important to consider the objects for which the relief was granted as well as the circumstances attending it. While the language of the decree or order should not be extended to cover acts not fairly and reasonably within its meaning, the violation of the spirit of an injunction, even though its strict letter may not have been disregarded, is a breach of the mandate of the court, which will not allow its process to be disregarded or evaded on merely technical grounds. No subterfuge amounting to a substantial violation of an injunction will be allowed to succeed simply because not contrary to the letter of the prohibitory clause. One who violates the letter of an injunction in reliance on his judgment that he does not violate its spirit acts at his peril; and if mistaken, his good faith is not a defense. He can not set up his opinion as to the meaning of the injunction against the court's opinion; but if he has any doubt as to what he may do without violating the injunction, he should ask a modification *Page 334 
of the injunction or a construction of its terms." It is further stated (p. 495, § 863): "Where the conveyance or disposal of property is enjoined, a conversion of the property, a conveyance or transfer intended to confirm one made prior to the injunction, delivery of the property sold before the injunction issued, offer to sell the property, or voluntarily allowing the property to be taken by one having no right to do so, may constitute a breach or violation of the injunction. Such an injunction is violated by any active interference by defendant or his agents for the purpose of having the legal title transferred to another."
In the recent case of Patten v. Miller, 190 Ga. 150 (8 S.E.2d 786), this court said that if the plaintiff in error "entertained any doubt as to what he might or might not do under the order, he should have asked for a modification or a construction of its terms. . . In cases of contempt the trial judge is vested with a discretion in determining whether his orders have been violated and how such infringements should be treated; and it has been said that this court will not disturb his judgment, unless it appears that he has abused his discretion." Compare Warner v. Martin, 124 Ga. 387
(52 S.E. 446, 4 Ann. Cas. 180). In Blood v. Martin, 21 Ga. 127, a plaintiff in attachment, who was enjoined from selling the attached property, stood silently by and saw the levying officer sell the property. It was held that he violated the injunction. In Baker v. Weaver, 104 Ga. 228 (30 S.E. 726), the owner of a millpond sought injunction to restrain another from cultivating land adjacent to the pond and from clearing away the trees and undergrowth near the banks. The court granted an injunction restraining the defendant from cutting the trees and undergrowth, but refused an injunction as to cultivating the land. The plaintiff himself was not expressly enjoined from doing anything; but after such refusal to enjoin cultivation, he increased the height of the millpond, and thus overflowed the land so as to prevent the defendant from cultivating it. It was held by this court that such action by the plaintiff "was clearly a violation of the order of court, and was a contempt." It was said: "The court had full power to order him to lower the dam so as to restore the status which had existed at the time the injunction was refused, and, if he refused or failed to obey this order, to attach him for contempt. Johnson v. Hall, 83 Ga. 281
[9 S.E. 783]." The order restraining the defendant from *Page 335 
indorsing and cashing the check reasonably comprehended disposition of the proceeds, and under the evidence the court did not err in adjudging the defendant to be in contempt. SeeMurphey v. Harker, 115 Ga. 77 (6, 7) (41 S.E. 585);Nance v. Daniel, 183 Ga. 538 (189 S.E. 21). It follows from what has been said, that the judgment granting an interlocutory injunction must be reversed, but that in all other respects it should be affirmed.
Judgment affirmed in part and reversed in part. All theJustices concur.