FORD MOTOR COMPANY *v.* ABERCROMBIE *et al.*

No. 17218. NOVEMBER 13, 1950. REHEARING DENIED NOVEMBER 27, 1950.

466

*MacDougald, Troutman, Sams & Schroder,* and *William H. Schroder,* for plaintiff in error.

*Poole, Pearce & Hall, J. R. Goldthwaite Jr., Jerome A. Cooper, Clifford Walker,* and *J. Benton Evans,* contra.

DUCKWORTH, Chief Justice. ■ Numerous decisions of administrative boards and courts of other jurisdictions, including many growing out of the same strike that is here involved, are cited in the brief of counsel for claimants, and they all held that the claimants there involved were entitled to unemployment compensation under State laws similar to our own. On the other hand, counsel for the employer have cited in their brief decisions of other jurisdictions where, under facts and law similar to that with which we are now dealing, it was held that the claimants to compensation were disqualified. While we have carefully examined all authorities cited and even more, the decisions of other jurisdictions are helpful to us in arriving at a proper decision only to the extent that they are well reasoned and the grounds upon which they are placed appear to us to be sound; but, after all, we must construe our own law by applicable controlling rules of construction and apply the facts as shown by the record to the law as thus construed. It is inadmissible to mutilate a statute by lifting a mere segment out of its context, and construe it without consideration of all other parts of the act. *Thompson* v. *Talmadge,* 201 *Ga.* 867 (41 S. E. 2d, 883). The cardinal rule to guide the construction of laws is, first, to ascertain the legislative intent and purpose in enacting the law, and then to give it that construction which will effectuate the legislative intent and purpose. This rule is well stated in the early case of *Erwin* v. *Moore,* 15 *Ga.* 361 (1), as follows: "The intention of the Legislature is the cardinal guide to a construction of statutes; and when *plainly collected,* should be carried into effect, *though contrary to the literal sense of terms.*" (Italics ours.) The unmistakable legislative intent is plainly spelled out by the legislature itself in section 2 of the act (Ga. L. 1937, p. 806) which we are now construing—that intent being to pay unemployment compensation during periods of unemployment to those workers whose unemployment is involuntary and is not the result of their own fault. The cardinal rule of construction above quoted requires a construction of this act which will carry into effect the intent as expressed in section 2 thereof; and, under the above decision, this must be done although it requires

a disregard of terms, the literal sense of which is contrary to the known legislative intent. An adherence to this controlling rule of construction would forbid payment of compensation therein provided to any unemployed person whose unemployment was voluntary or the result of his own acts, even though that portion of the act found in Code (Ann. Supp.) § 54-610(d) (Ga. L. 1937, p. 813) had been omitted entirely. That rule requires that, if there be found in Code (Ann. Supp.) § 54-610(d) any terms the literal meaning of which conflicts with the expressed legislative intent, it must be disregarded. The legislative intent and purpose, that only the involuntarily unemployed whose unemployment is not the result of their own fault, is the foundation upon which the entire act rests; and that intent and purpose runs irresistibly through every paragraph and sentence of the whole law and is supreme and controlling in the construction of all paragraphs and sentences. This cardinal rule has been uniformly adhered to by this court. *Ezekiel* v. *Dixon*, 2 *Ga.* 146; *Pinkerton Detective Agency* v. *Walker*, 157 *Ga.* 548 (122 S. E. 202); *Mayor &c. of Montezuma* v. *Brown*, 168 *Ga.* 1 (147 S. E. 80); *Davison* v. *Woolworth Co.*, 186 *Ga.* 663 (198 S. E. 738); *Carroll* v. *Ragsdale*, 192 *Ga.* 118 (15 S. E. 2d, 210).

Another rule of construction is that, where a law is susceptible of more than one construction, it must be given that construction which is most equitable and just. *Lombard* v. *Trustees, Young Men's Library Fund*, 73 *Ga.* 322. Without a doubt it would be inequitable and unjust to compel employers, as is done by this act, to contribute their own money to the fund from which unemployment compensation is paid for the express purpose of paying employees during periods of involuntary unemployment, and then divert an employer's contribution from its lawful purpose by giving it to former employees during their unemployment which was brought about by their voluntary and deliberate act while the employer sought to prevent their work stoppage. To thus use such funds would be unjust. To be just before one is generous is a good rule for governments as well as individuals.

In the light of the foregoing rules and principles, we examine Code (Ann. Supp.) § 54-610(d). Other provisions of the act, after stating its intent and purpose in section 2, as above pointed

out, direct that compensation during periods of unemployment be paid from the fund therein provided for. The clause now under consideration is designed to disqualify for such compensation when to allow it would defeat the expressed intention of the law. The particular words of this section which form the basis of this controversy and which we must construe are "factory, establishment, or other premises." Counsel for the claimants contend that these terms are defined by the legislature in subparagraph 2 of the foregoing section. This contention is based upon the following provision: "if in any case separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment, or other premises." And it is contended that, as thus defined, the terms used are limited to a single department and, as applied to the facts of the present case, would mean that the plant at Hapeville, to the exclusion of the parts-producing plant in Dearborn, is a "factory, establishment, or other premises" as contemplated by the law. This contention is refuted by the plain words of the clause relied upon for, under that clause "separate branches of work" is not sufficient, but added thereto is the requirement that such branches must be "commonly conducted as separate businesses in separate premises" before a single plant can be treated independently of other plants. The paragraph relied upon simply means that, if a plant devoted to the manufacture of machinery and a plant devoted to the manufacture of furniture, though having a common owner and operated on the same premises, remain separate as they had been and are by the nature of the work engaged in, each constitutes a factory, establishment, or other premises. In such a case there would be a distinct difference, in that each is a complete factory within itself, from the case with which we are dealing where the plant involved is the assembly plant at Hapeville, which is an indispensable and inseparable part of the automobile factory, including the parts-producing plant at Dearborn, and both of which are engaged in the one job of manufacturing Ford automobiles. Failure to function upon the part of either would defeat the single objective of both, which is manu-

facturing "Fords." The Hapeville assembly plant and the Dearborn parts-producing plant where the strike occurred are not separate but are inseparable, each depending upon the other for the functions assigned to it in order to complete the manufacturing processes essential to making Ford automobiles. If the two were located in the same building, there could be no question but that they would constitute one factory engaged in making one article. It can not be held on any basis of reason and logic that the mere separate locations, regardless of the distance, of these indispensable functions do and could change them into two separate factories, establishments, or other premises.

Both the employer, and these employees acting through their agent, the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, UAW-CIO, regarded the Ford assembly plant and the parts-producing plant as one factory, establishment, or other premises, and as being commonly conducted as such when they executed the contract of employment, for that contract covers each and every plant devoted to the manufacture of Ford automobiles and it likewise covers each and every employee in such plants. By that contract both parties recognize and treat all plants as a single business and that all employees were to work in that single business. To theorize on dictionary definitions and speculate as to a possibility that these plants constitute separate businesses or establishments, in the light of the indisputable facts, is to ignore reality. We therefore hold that the Hapeville plant, at which the claimants were employed, and the Dearborn parts-producing plant, where the strike occurred and which compelled cessation of work at the Hapeville plant, were inseparable and indispensable parts of one and the same "factory, establishment, or other premises" as contemplated by those terms as employed in the act now being construed.

Our construction accords with that placed upon the Michigan statute in Chrysler Corp. v. Smith, 297 Mich. 438 (298 N. W. 87), and the Wisconsin statute in Spielmann v. Industrial Commission, 236 Wis. 240 (295 N. W. 1). In each of the cited cases the law contained a disqualifying clause similar to our own, with the exception that the words in our law, "factory, or other premises," were omitted. Both cases involved claims to unemploy-

ment compensation by employees of one plant resulting from a strike in another plant located on separate premises, but all engaged in the manufacture. of the same automobile, and in each case the claims were denied. Counsel for the claimants contend that since the statutes there dealt with did not contain the words, "factory, or other premises," they were materially different from our law. We can not sustain this contention. Ejusdem generis would not alter the meaning of the words "factory" and "establishment," but does restrict the general words, "or other premises," to premises similar in character and nature to that of the preceding words "factory" and "establishment." Counsel for the claimants cite Tennessee, Coal, Iron & R. Co. v. Martin, 33 Ala. App. 502 (36 So. 2d, 535). There, the Alabama court had for decision a case made by claims for unemployment compensation by coal miners, where their unemployment resulted from a shutdown in the mines following a strike in ore mines, quarries, and a manufacturing plant, all owned by the claimants' employer, and it was held that the claims were valid. The facts there were definitely different from the facts in the present case. Operations in the ore mines, the quarries, and the factory do not appear to have been related to the work in the coal mines. However, in the opinion, the Alabama court undertook to distinguish its decision from the Michigan and Wisconsin decisions, supra, upon the basis that in neither of those decisions was the rule of liberal construction in favor of the employees applied, whereas the Alabama court applied that rule as well as the rule of strict construction against disqualification. We find no justification for the application of either of those rules in the present case. Under our law, funds with which to pay benefits are supplied by employers, and such exactions from employers are justified when without any fault of their own employees are involuntarily unemployed. But where unemployment is voluntary or due to the fault of the unemployed, to require employers, who sought to persuade them to return to work, to supply the money with which to pay them would encourage and reward idleness and impose an unjust and intolerable burden upon the employers by arbitrary and discriminatory legislation. To construe our act to authorize such payments, would be to render it unconstitutional in that it would thereby make donations or gratuities in violation

of the plain inhibition of the Constitution. Code (Ann.), § 2-5402(1) (Ga. L. 1945, p. 57). And it would be void for the further reason that it classified employers for the purpose of imposing a tax upon them while exempting others, when there is no possible relation between the basis of such classification and the objective of donations and gratuities to those workers who had qualified under the act during periods while they are voluntarily unemployed due to their own fault. Constitution, art. 7, sec. 1, par. 3 (Code, Ann., § 2-5403; Ga. L. 1945, p. 58) ; *Wright* v. *Fulton County,* 169 *Ga.* 354 (150 S. E. 262) ; *Geele* v. *State,* 202 *Ga.* 381 (43 S. E. 2d, 254, 172 A.L.R. 196).

Counsel for the claimants also quote in their brief from Phillips Co. *v.* Walling, 324 U. S. 490 (65 Sup. Ct. 807, 89 L. ed., 1095, 157 A.L.R. 876) which is cited by the Alabama court in its opinion. In the Phillips case it was contended that the forty-nine retail establishments and one wholesale establishment under one ownership should be classified as "a retail establishment," and the decision refused to sustain that contention. A mere statement of the facts clearly shows the inapplicability of that decision in the present case. Counsel also cite Tucker *v.* American Smelting & Refining Co. (Md. App.) 55 Atl. 2d, 692. That decision simply held that employees of a smelter plant in Utah and the employees of a refining plant in Maryland worked at separate and independent establishments. Of course they were separate establishments, and that decision is wholly irrelevant here. Many other authorities are cited in the briefs, and while we have carefully examined them, further discussion of such decisions would seem unnecessary since, for the reasons above pointed out, we must hold that the Hapeville plant and the parts-producing plant in Dearborn constitute but one "factory, establishment, or other premises" as contemplated by our law.

■ This record shows that the claimants took no action at the Hapeville plant that shows voluntary unemployment or that any direct acts of theirs caused the unemployment. The law is more concerned with whether or not the unemployment is chargeable to the claimants than with the method or means by which they brought it about. Obviously, the claimants would be disqualified if they caused their unemployment by direct action in simply walking away from their work stations and refusing to return.

Are they allowed to accomplish the same result by indirection, in having their labor union authorize work stoppage in the parts-producing plant, which they knew must inevitably compel work stoppage at the Hapeville plant? There is a maxim of law that answers this question in the negative. Quando aliquid prohibetur ex directo, prohibetur et per obliquum (Coke Litt., p. 223; Bouvier's Law Dictionary), which means that when anything is prohibited directly it is also prohibited indirectly. This rule was applied in *Blood* v. *Martin*, 21 *Ga.* 127, where it was said of the defendant Martin, who was enjoined from selling certain property: "A command to him to abstain, was a command to him to abstain not only by himself, but also by his agents." It was followed in *Dunn* v. *Harris*, 144 *Ga.* 157 (86 S. E. 556), where it was said: "A defendant who is enjoined from doing a particular act can not with impunity evade the force of the injunction by permitting the act enjoined to be done by his agents or in his presence with his acquiescence." See, in this connection, *Baker* v. *Weaver*, 104 *Ga.* 228 (30 S. E. 726); *Reid* v. *McRae*, 190 *Ga.* 323 (9 S. E. 2d, 176); *Corley* v. *Crompton-Highland Mills*, 201 *Ga.* 333 (39 S. E. 2d, 861); *Pedigo* v. *Celanese Corp. of America*, 205 *Ga.* 392 (54 S. E. 2d, 252). This rule of law requires us to hold that these claimants are disqualified if by the indirect and circuitous route of acting through the officers of the International Union as their agents, they allowed the strike in the Dearborn plant and thereby knowingly and deliberately forced work stoppage at Hapeville resulting in their own unemployment.

Every essential ingredient of the relationship of principal and agent between the International Union and these claimants as members of the union is undeniably shown by this record. The union officers are chosen by delegates from each of the locals, who are elected by the vote of all of the members of such locals. The constitution of the union defines the powers and duties of its officers. These include authority to execute, in behalf of all members, employment contracts and to approve or disapprove all strikes, and provide that, notwithstanding a vote of the workers of a plant in favor of a strike, it can not be called until and unless the officers of the union approve and authorize it. The officers are empowered to order a return to work, and failure to obey such order is grounds for forfeiting the local's charter. It

is thus seen that, holding the power to prevent all strikes, the union officials, as agents for every individual member, are, in equal measure, responsible for all strikes. This responsibility of the agent is the inescapable responsibility of every member of the union as principal. This power is beneficial to all non-strikers, in that it enables them through the union officials, as their authorized agents, to prevent a strike where they think it is unjustified or will injure the non-strikers. They are not permitted to enjoy this privilege and benefit without, at the same time, bearing full responsibility for the consequences resulting from a strike which they, in this manner, authorize and allow. The actions of the union officials here involved were expressly authorized by the constitution. There is no basis of fact, therefore, for the contention that they were beyond the scope of the agent's authority or powers vested in those officials by the individual members, including these claimants, through their constitution. It would be an evasion of the hard fact to contend that, in allowing or disallowing a strike, the union officials acted in the limited capacity of agents for those only who voted to strike and were divested of their character as agents of all non-striking members in the performance of a duty expressly imposed by the constitution. Indeed, these union officials have no existence apart from their existence as mere agents for the members who chose them and vested in them the powers expressed in the constitution. Remove the individual members and the union is destroyed. Its officials would have no duties to perform and no reason to exist as such. The union, as represented by its constitution and officers, is devoted to the high purpose of protecting the interest and promoting the welfare of each individual member, including these claimants. To accomplish this task, it is necessary that its officials be vested with broad powers to act in behalf of, in the name of, and as true agents of each and all of its members. To challenge the authority of the officers to act as agents of the members within the scope of powers conferred by the constitution, would at once challenge the validity of an employment contract executed by them in behalf of the members; and that challenge would be sustained if a similar challenge of the act, in allowing or disallowing a strike in virtue of authority conferred by the constitution, is held to be beyond

the scope of the agency and not chargeable to the individual members. We therefore hold that, in allowing the strike in the parts-producing plant, the officers of the union were clearly within the scope of their authority as defined in the constitution; and that they so acted as the authorized agents of these claimants, and their act is chargeable to the claimants. The principal is bound by the authorized acts of his agent as effectively as if he had been present and personally committed that act. *Georgia Military Academy* v. *Estill*, 77 *Ga.* 409; *Fulton B. & L. Assn.* v. *Greenlea*, 103 *Ga.* 376 (29 S. E. 932); *Bass Dry Goods Co.* v. *Granite City Mfg. Co.*, 119 *Ga.* 124 (45 S. E. 980); *Raleigh Railroad Co.* v. *Pullman Co.*, 122 *Ga.* 700 (50 S. E. 1008); *Turner Bros.* v. *Clarke*, 143 *Ga.* 44 (84 S. E. 116); *Pickens Co.* v. *Thomas*, 152 *Ga.* 648 (111 S. E. 27); *Cocke* v. *Bank of Dawson*, 180 *Ga.* 714 (180 S. E. 711).

In Prentice v. Unemployment Compensation Board, 161 Pa. Super. 630 (56 Atl. 2d, 295), the Pennsylvania court recognized the responsibility of the individual members for actions of the union officials, and in Department of Industrial Relations v. Pesnell, 29 Ala. App. 528 (199 So. 720), the Alabama court did likewise. It would be a refusal to admit the existence of known facts to deny that, under the law of agency, the actions of union officials in allowing the strike in the parts-producing plant was the action of these claimants just as effectively as if each of them had personally cast his vote in favor of that strike. Obviously, in allowing a strike in the parts-producing plant with knowledge that it would force unemployment at the Hapeville plant, these claimants then and there through their agents, the union officials, made the decision that they did not wish to work, and their subsequent profession of a willingness and a desire to work must be wholly discredited. Had they desired to continue work, the time to manifest that desire was when the decision was made as to whether or not a strike in the Dearborn plant would be allowed. The decision to allow it is conclusive proof of a desire to stop work at Hapeville. A decision to disallow it would not only have been conclusive proof of a desire to continue work, but would have in fact permitted continuance. But even after that decision was made, the employer requested the union officials to order some 60,000 employees, including the

employees of the parts-producing plant, to return to work and allow only the few thousand on whose labor complaint the strike was called to continue the strike. To this suggestion the union replied that it was fantastic, and that the interest of the employees was protected by their solidarity. Had these claimants desired to work, even then that desire could have and should have been manifested by an order of their agents, the union officials, to return to work in the parts-producing plant. It is obvious, therefore, that the unemployment here involved was neither involuntary nor free from the fault of these claimants and, hence, is not compensable under the law. It must be held that the Court of Appeals erred in holding that these claims were valid and entitled to payment.

■ In the brief of counsel it is stated that, after the initial determination allowing benefits had been affirmed by a review tribunal, all claims here involved were paid as provided in Code' (Ann. Supp.) § 54-612. This would raise a question as to whether or not the case is moot. But in view of a further provision in the same section that claims thus paid, but on final review held invalid, shall not be charged to the account of the employer whose contributions are increased in proportion to the compensable unemployment experienced by his employees—thus giving the employer a vital interest—we must decide the case on its merits.

However, by making no ruling on the effect of such payments we do not imply that the intent of the law can be thus nullified nor that, as to the claims herein held invalid, it was competent for the legislature, in view of the Constitution (Code, Ann., § 2-5402(1); Ga. L. 1945, p. 57), to authorize their payment. See also *Dennison Mfg. Co.* v. *Wright,* 156 *Ga.* 789 (120 S. E. 120); *Franklin* v. *Harper,* 205 *Ga.* 779 (55 S. E. 2d, 221).

The general rule is that while a judgment, in the absence of a supersedeas, may be enforced pending timely appeal, this will be subject to making restitution in the event of a reversal on appeal. *Jordan* v. *Jordan,* 16 *Ga.* 446; *Richmond & Danville R. Co.* v. *Buice,* 88 *Ga.* 180 (14 S. E. 205); *Hudson* v. *Alford,* 118 *Ga.* 669 (45 S. E. 454).

*Judgment reversed. All the Justices concur.*